[Cite as *Tyra v. Griffith*, 2025-Ohio-912.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

NUGENT TYRA, III,

    Plaintiff-Appellee,

  vs.

JULIE ANNE GRIFFITH,

    Defendant-Appellant.

:

:

:

:

:

:

APPEAL NO.   C-240189
TRIAL NO.    DR-1101775


*O P I N I O N*


Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 19, 2025


*DeSantis Family Law, PLLC,* and *Emily M. DeSantis,* for Plaintiff-Appellee,

*Julie Griffith,* pro se.

**BOCK, Judge.**

**{¶1}** In this divorce case, defendant-appellant Julie Griffith ("Mother") appeals the trial court's judgment denying her motion to modify plaintiff-appellee Nugent Tyra, III's ("Father") parenting time. In three assignments of error, Mother challenges the merits of the trial court's decision, the exclusion of evidence at the parenting-time hearing, and the admission of the guardian ad litem's ("GAL") testimony at the hearing.

**{¶2}** First, we hold that the trial court did not abuse its discretion when it denied Mother's motion to modify Father's parenting time. The evidence supported the trial court's finding that Father had made progress in his relationship with his children and that a reduction in his parenting time was not in the children's best interests under R.C. 3109.051(D).

**{¶3}** Second, the trial court committed no due-process violation in addressing Mother's parenting-time motion at the hearing, as Mother received ample notice—more than two weeks—that her motion would be considered. Likewise, the trial court acted within its discretion when it imposed temporal constraints on the evidence at the hearing and limited Mother's evidence to events that occurred after 2022 because Mother's evidence of Father's criminal past was cumulative to evidence in the record. Moreover, the temporal limitation was consistent with a 2022 agreed entry reinstating Father's parenting time that the parties submitted six months after Father was charged with domestic violence.

**{¶4}** Third, Mother forfeited her challenge to the GAL's testimony on appeal because she failed to object to the GAL's testimony at the hearing and failed to argue that the admission of that testimony was plain error.

**{¶5}** We affirm the trial court's judgment.

### I.  Factual and Procedural History

**{¶6}**   During their 13-year marriage, Mother and Father welcomed three children: E.T.G., A.T.G., and G.T.G. Mother and Father divorced by decree in 2016.[1] In its decree, the trial court awarded Mother custody of the children, named Mother the residential parent, and awarded Father parenting time twice a week.

**{¶7}**   The parties have filed nearly 50 postdecree motions, such as requests for modification of the support and parenting-time orders, and for contempt. The parties have asked the trial court to appoint a GAL and a parenting coordinator, only to request the GAL's and parenting coordinator's removal months later.

*Postdecree parenting-time issues*

**{¶8}**   This appeal involves the trial court's March 2024 order denying Mother's motion to modify Father's parenting time.

**{¶9}**   Mother and Father were represented by counsel in October 2021 and agreed to a parenting-time schedule granting Father weekly time with the children from Tuesdays to Wednesdays, and every other weekend. But in August 2022, Mother moved to suspend Father's parenting time. She alleged that in April 2022, Father had been charged with two counts of domestic violence after an altercation with his current fiancée, in the presence of his children. Mother attached a Peoria Police Department "Criminal Report." She also alleged that Father had trespassed on her property, and that in 2020, Father was convicted of criminal endangerment and subject to a civil protection order filed by his second wife. In addition to limiting Father's parenting time, Mother asked the court to restrict his attendance at the children's activities, his

---

[1] In 2014, this court reversed the first divorce decree ordered in this case and held that the trial court committed plain error by "conduct[ing] [the trial] wherein affidavits completely replaced direct testimony." *Tyra v. Tyra*, 2014-Ohio-5732, ¶ 1 (1st Dist.).

communication with the children to Family Wizard emails, and his contact with school personnel and coaches.

{¶10} Yet in October 2022, the parties filed an agreed entry giving Father four weeks of supervised parenting time. That same day, the magistrate awarded Father four weeks of supervised visitation with A.T.G. and G.T.G. Over the next few months, the court extended Father's parenting time.

{¶11} In April 2023, Mother supplemented her August 2022 motion to suspend Father's parenting time. She cited Father's chronic lateness at parenting time (anywhere from five to 24 minutes) and his aggression towards the GAL and others. But following a hearing that same day, the trial court extended Father's parenting time for five more weeks, instructed Mother to give Father a 15-minute grace period, and continued the parenting-time and child-support matters.

{¶12} Six days before a May 2023 hearing, Mother moved to reduce Father's parenting time to two monthly visits. Her one-sentence motion contained no allegations or facts in support of reducing Father's parenting time. She also asked for a continuance. The trial court granted the continuance, instructed the clerk to schedule the hearing within 60 days, and warned the parties that "no further continuances shall be granted in this matter." Days later, Father moved to modify the existing parenting-time order. The next week, the trial court issued a parenting-time schedule effective through the June 2023 hearing.

{¶13} In July 2023, the matters were continued to August 2023 for a "'video conference' before [the trial court] for Parenting Time." The next day, the trial court awarded Father two hours of unsupervised parenting time with the children every week and instructed the parties to exchange the children at a neutral site because of "the significant degree of conflict between the parents."

**{¶14}** In October 2023, Mother again supplemented her parenting-time motion—the supplement made no reference to her May 2023 parenting-time motion. She alleged that Father was late to his parenting time and failed to inform her where he had taken the children during his parenting time. Mother also asked for the GAL's removal. Days later, the trial court scheduled a status conference and appointed a parenting coordinator to monitor and decide parenting-time issues.

**{¶15}** In November 2023, Mother moved for contempt, alleging that Father failed to inform her when he would arrive late to parenting time, lied to Mother about where he had taken the children during parenting time, and embarrassed G.T.G. at a soccer game by yelling at players "in close proximity" to G.T.G. The trial court continued the case to December 2023 for "REPORT/ MOTION/ CONTEMPT." Meanwhile, Mother moved to extend child support for E.T.G., a high school student, who had turned 19 years old that month.

**{¶16}** In a scheduling order, the trial court scheduled a status hearing "for a report on parenting time," stated that the "case is scheduled for February 14, 2024," for "TRIAL ON CASTLE CHILD MOTION." It directed the parties to complete discovery by mid-January 2024 and exchange witness lists, evidence lists, and original copies of evidence seven days before the hearing. Attached to that order was a notice that the hearing would address "Motion – Modify/Other."

**{¶17}** In early January 2024, the trial court increased Father's parenting time to two hours of "dinner-time visits" with A.T.G. and G.T.G., and three hours of parenting time on alternating weekends. Later that month, Mother requested a 60-day continuance of the February hearing "to best represent to the Court new information and pending application for disability." The trial court denied that motion and informed the parties that the February 2024 hearing would address both

5

"Mother's *Motion to Extend Child Support* filed November 16, 2022," and Father's "continued parenting time."

**{¶18}** The parenting coordinator issued two decisions before the February 2024 hearing. First, it instructed Mother and Father to communicate through "PROPERCOMM" because both tend to make "degrading comments" and disparaging remarks. Second, they were ordered to refrain from using the children "to communicate about parenting time" and from speaking disparagingly about the other parent to the children. The parenting coordinator noted that both parents "talked to each other disparagingly in emails" and that Father "believes the lack of boundaries and this commentary is overflowing into interactions with the children." The parenting coordinator found that Mother's and Father's "negligence in communicating with each other and instead resorting to communicating through the children is causing undue stress on the children."

### *February 2024 hearing*

**{¶19}** At the hearing, the trial court informed the parties that they would address child support and the parenting coordinator's recommendation, and then "plot a path forward for [Father's] ongoing parenting time."

**{¶20}** The trial court asked the parenting coordinator about efforts to extend "Father's parenting time," because the "longterm goal is to move [to] something more normalized." The parenting coordinator answered that, "[T]hings are moving in the right direction." Mother asked the parenting coordinator why Father was rewarded with more parenting time despite his "[m]any, many contempts." The parenting coordinator and the trial court explained to Mother that, while contempt violations could result in monetary penalties, the proper focus was not punishing Father.

6

Instead, the court's focus was restoring a normal relationship between Father and the children before they enter adulthood.

{¶21} After concluding the portion of the hearing addressing extended child support for E.T.G., the trial court turned its attention to Father's parenting time. The GAL provided extensive testimony. Beginning with E.T.G., the GAL was concerned with the child's "ability to have meaningful contact and relationship with her dad." E.T.G. "has certain disabilities" and may "not be able to always assert for herself or process and synthesize the entire situation [and] what is going on." The GAL observed "some estrangement and alienating behaviors," and described it as a "hybrid case," which "is where a parent engages in a pattern that negatively impacts their relationship with that child, legitimately." E.T.G. indicated to the GAL that "she loves dad" but is "confused by the situation." The GAL believed that Father's behaviors could affect E.T.G., who is sensitive to loud noises, yelling, and "agitations." While he showed some concerning behaviors, the GAL saw "growth in Dad during [her] involvement with the family" and "making an effort." The GAL wanted E.T.G. to remain in contact with Father in a way that would enable her to work through their conflicts and issues.

{¶22} Turning to G.T.G. and A.T.G., the GAL interviewed the children after unsupervised parenting time had started at Father's residence. Father had made progress with his relationship with A.T.G., who is "a very go with the flow, happy, looking on the positive side kind of kid." A.T.G. recognizes Father's flaws, but "also loves him and wants to have a normalized situation." While A.T.G. knows "Mom has her own perspectives," she understands that she is allowed to think differently than Mother and "is less affected by that dynamic." A.T.G. told the GAL that Father had "behaved," was not driving aggressively, had been relatively on time, and was calling and text messaging in a "pretty normal" fashion. A.T.G. likes seeing Father Tuesdays

after school and every other Saturday, and "likes the amount of time." A.T.G. told the GAL "that the days are really good." To A.T.G., "it feels normal and better," and "much more comfortable than it used to be." A.T.G. has "no problem with [Father's fiancée]," who lives with Father, but A.T.G. prefers that she is not present during parenting time.

**{¶23}** The GAL testified that the children dislike Father's fiancée. Father's fiancée was present in April 2022 when "there was a domestic violence incident between Dad [] and his brother," but the GAL explained Father's fiancée is more of an annoyance to the children rather than a danger. The GAL believed that the children's opinions are shaped by "Mom's position on [Father's fiancée]," which "has impacted their ability to develop a relationship with [her and] to have accepted her into their lives." Mother contacted the GAL after a visit with Father did not "go well," because Father's fiancée "showed up at the house, and she shouldn't have, and the kids were very upset by that." But A.T.G. clarified to the GAL that they had just returned home for dinner after pickleball, which was "really fun." His fiancée arrived "at the very end," stayed for roughly 15 minutes, and hugged the children.

**{¶24}** The GAL described her interview with G.T.G. as "odd" and felt "like [G.T.G.] was trying to get across talking points, like by things he felt like he had to say." The GAL found it "important" to discuss "a pattern[,] that when Mom is upset with someone," G.T.G. "seems to mirror Mom's dislike of somebody." Mother was upset on the day of G.T.G.'s interview and the GAL was concerned that Mother's sharing of her dislike for the professionals involved in the case "undermine[s] the benefit of that professional to the children." The GAL noted that G.T.G. appeared to be "very annoyed with his dad[] and alienated."

**{¶25}** G.T.G. told the GAL that "things are fine with Dad" and Father was behaving during visitation. But G.T.G. found it weird that Father was "really sad," and

cried, after Father's dog died. G.T.G. tried to support Father "but it was weird" and "just a dog." That response was "not responsive" to the question the GAL had asked: how Father had behaved in the car. The GAL found it "significant that [G.T.G.] had that perspective" about the dog, which was "kind of cold." Apparently, Father's dog died "minutes before" parenting time, Father was "15 minutes late," and G.T.G. insisted that Father "really should have been on-time." G.T.G. told the GAL that Father lies about things that "don't matter," like being on time for parenting time when he caused the children to wait in the cold for five minutes.

{¶26} G.T.G.'s account of his interaction with Father's fiancée contradicted A.T.G.'s account. According to G.T.G., Father's fiancée was present for 15 minutes and "it was really weird because she started crying about the dog," and then left. G.T.G. did not understand why she cried about the dog in front of them. G.T.G. said the parenting-time schedule was "fine," but he doesn't want to see Father's fiancée. Father texts G.T.G. regularly, but if G.T.G. does not respond immediately, Father sends a "barrage of texts" asking if Father's phone number is blocked.

{¶27} The GAL was concerned that "the communication between the parents is so awful" and "Mother does take every opportunity she has to remind everyone that Dad went to jail." The GAL emphasized the need to "undo whatever we can about [G.T.G.'s] perspective" on his relationship with Father that both Mother and Father contributed to. The GAL noted that Father has positive experiences with G.T.G., but G.T.G. struggles "to allow himself to acknowledge it." The GAL explained that G.T.G.'s "major need is feeling safe and not feeling like he's different," and "[h]e feels different because all of his friends know about his family situation and his dad."

{¶28} The GAL recommended a "step-up schedule" that eventually "get[s] to a place where [the children and Father are] having a full day, they're doing their stuff."

9

This would be monitored by the parenting coordinator, and if approved, would include "full weekends."

**{¶29}** Before Mother cross-examined the GAL, Mother explained that "the Court changed what [the hearing] was about today [and] added on parenting," which threw her in a "tailspin." Mother informed the trial court that she had "exhibits for parenting, that my attorney failed on," consisting of "stuff in the last five years," including "[d]omestic violence with his second wife."

**{¶30}** The trial court informed Mother that she could not discuss her prior counsel's "failings," and it would not consider evidence that was "more than two years old." Mother noted that evidence of events that occurred more than two years ago was "all of the history leading up to" the circumstances of the last two years. In response, the trial court told Mother that it understood "the history" and it had "read the entire record" when the trial court judge was assigned to the case. The trial court was aware that Father "had a domestic violence," as well as "two protection orders," one filed by Mother and the other by Father's second wife. It also assured Mother that it was not expecting mother to "move on" from the issues in the past, but "move forward."

**{¶31}** Mother's cross-examination of the GAL consisted of a mix of questions and Mother's own testimony. Mother explained that G.T.G.'s cold demeanor following the death of Father's dog was attributable to G.T.G. having witnessed Father kicking "their dogs all the time." Father would "kick him down the steps," which caused G.T.G. to believe Father's tears were fake. Mother expressed concern with the GAL's portrayal of G.T.G. as "cold" because the GAL is not a mental-health professional and her characterization of G.T.G. is "really off." Mother was frustrated with how she may be perceived in the emails referenced by the GAL and parenting coordinator because "there's just a lot more to it than what you see in an email, and me being mad." Mother

also explained that G.T.G. "gets so frustrated" being involved with the proceedings.

**{¶32}** The GAL testified that she understood the case history, this is a "difficult situation," and that the GAL is unqualified to diagnose mental-health issues. But the GAL can recognize problematic behavior patterns and believed that "[t]here are problem behaviors here" from both Mother and Father. The GAL stressed the need to look at "April 2022 forward" and "what has happened then to now." According to the GAL, G.T.G. feels the weight of the familial dynamics more than his siblings. During the interview with G.T.G., the GAL "saw [] a rejection of everything that [Mother] was rejecting" and "behavior that was very awkward and very weird from a kid" that the GAL was familiar with.

**{¶33}** The trial court emphasized to the parties that the children "are feeling the weight of all of it . . . the tension of all of it . . . the negativity that each of you express about the other." The trial court addressed Father's issues of alienation and his history of anger but noted that he is "addressing it" and the "children say you're doing great." It reminded Father to focus on the good and to keep "doing what you're doing," but also that he needs to work with the parenting coordinator "on the issues with [G.T.G.]."

**{¶34}** The trial court accepted the GAL's recommendation and informed the parents that its decision would include the graduated parenting schedule.

### *The trial court denied Mother's motion to modify Father's parenting time*

**{¶35}** The trial court "reviewed the applicable R.C. 3109.04(F)(1) factors" and denied Mother's May 2023 motion to modify parenting time. It recognized that "Father was involved in a domestic violence incident" with the children present, but noted the GAL had worked with Father to improve Father's relationship with the children. It also recognized Mother's "ongoing concerns" that Father does not follow court orders and her belief that "the children are not safe with Father."

11

**{¶36}** It cited the GAL's characterization of the children's estrangement with Father as a "hybrid situation," caused by both Mother's and Father's behaviors. Mother's enmeshment with the children and "alienating behaviors are factors in the children's estrangement from Father." But "Father's own behaviors have contributed." While Father had made progress with A.T.G., G.T.G. remained alienated and "mirror[s] Mother's dislike or distrust of certain professionals." The trial court agreed that Father's fiancée's presence during parenting time violated a court order. But while Mother's concerns were not "unwarranted" due to the history of the case, "Father has demonstrated growth by following the recommendations of the GAL."

**{¶37}** The trial court found that a parenting schedule with incremental increases in Father's parenting time was appropriate. The schedule started with "one weeknight two-hour visit and one four-hour period each weekend" and could increase, if approved by the parenting coordinator, to "two weeknight three-hour visits and alternating weekends from Friday to Monday." Father was also awarded "holiday parenting time with the hours determined by the Parenting Coordinator." And Father could "exercise his parenting time at his residence" with his fiancée present.

## II. Analysis

**{¶38}** Mother appeals and raises three assignments of error. First, she challenges the trial court's decision to deny her motion to modify Father's parenting time. Second, she argues that the trial court violated her constitutional rights when it prevented her from entering evidence related to Father's criminal past and changed the scope of the hearing. Third, she maintains that the GAL failed to perform her duties under Sup.R. 48, and it was an abuse of discretion to permit the GAL to testify and recommend additional parenting time.

## A. *The trial court did not abuse its discretion when it denied Mother's motion to modify parenting time*

**{¶39}** Mother argues that the trial court abused its discretion when it denied her motion to modify Father's parenting time.

**{¶40}** Trial courts exercise broad discretion in granting or denying motions to modify parenting time. *Souders v. Souders*, 2022-Ohio-1953, ¶ 13 (1st Dist.). Its discretionary authority over parenting time is broader than its authority in child-custody matters. *Appleby v. Appleby*, 24 Ohio St.3d 39, 41 (1986). We will not reverse the trial court's decision unless we find an abuse of discretion. *In re T.M.*, 2020-Ohio-6950, ¶ 22 (1st Dist.). A trial court abuses its discretion when its "decision was unreasonable or arbitrary." *Kane v. Hardin*, 2019-Ohio-4362, ¶ 6 (1st Dist.). The trial court's "decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161 (1990). When analyzing a trial court's parenting-time decision, we defer "to the trial court's factual findings because it is better situated to judge the credibility of the witnesses and the weight to be given the testimony and evidence." *Hagan v. Hagan,* 2019-Ohio-51, ¶ 45 (5th Dist.).

**{¶41}** Any modification of parenting time must be in the best interest of the child. *In re T.M.* at ¶ 22. Ohio's parenting-time statute instructs courts to "ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child." R.C. 3109.051(A). Mother does not explain how or why the trial court erred in its best-interest analysis.

**{¶42}** We begin with the trial court's statement that it "reviewed the applicable factors set forth in R.C. 3109.04(F)(1)" and found that a step-up parenting-time

schedule for Father was in the children's best interest. The decree established Mother as the children's residential parent and legal custodian. But "'when one parent is the legal custodian, modifications to visitation or parenting time are not governed by [R.C. 3109.04 and instead] such modifications are subject to R.C. 3109.051.'" *Bohannon v. Lewis*, 2022-Ohio-2398, ¶ 28 (1st Dist.), quoting *Hartman v. Hartman*, 2019-Ohio-1637, ¶ 16 (8th Dist.). Yet, "the factors set forth in the two sections are quite similar and reliance on the factors in the wrong section is harmless error when the trial court's decision demonstrates consideration of the relevant factors." *Id.* at ¶ 31.

**{¶43}** To determine the best interest of a child in the context of parenting time, the trial court must "consider the fifteen factors enumerated" in R.C. 3109.051(D). *Braatz v. Braatz,* 85 Ohio St.3d 40, 44 (1998); *see Bohannon* at ¶ 29. Under R.C. 3109.051(D), the trial court must consider:

(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, . . . ;

(2) The geographical location of the residence of each parent and the distance between those residences, . . . ;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers . . . the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

14

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child;

. . .

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

**{¶44}** The trial court did not explain which R.C. 3109.04 factors guided its best-interest analysis, but its findings are applicable to several best-interest factors under R.C. 3109.051(D), including (1), (5)-(10), and (16). It recognized both Father's "domestic violence incident" in April 2022, which temporarily paused Father's parenting time, and his behaviors that have contributed to estrangement between

Father and G.T.G. It also recognized that Father's fiancée's brief presence during one parenting-time session violated a court order. So, it found that Mother's concern for the children's safety with Father was "not unwarranted."

**{¶45}** But the trial court reasonably found that several facts weighed against reducing Father's parenting time. The GAL and parenting coordinator had worked with Father and the children to improve their relationship, and "Father has demonstrated growth by following the recommendations of the GAL." Neither A.T.G. nor G.T.G. reported any recent issues with Father's "outbursts of anger" or aggressive driving. Instead, both children remarked that Father's behavior had improved. Plus, neither child expressed to the GAL a desire to reduce Father's parenting time.

**{¶46}** Moreover, the trial court cited the GAL's testimony that Mother contributed to the alienation of G.T.G. from Father. A parent's alienating behaviors are "particularly relevan[t]" to the best interest of a child. *See In re J.L.C.*, 2019-Ohio-2721, ¶ 35 (7th Dist.); *see J.H. v. J.F.*, 2021-Ohio-24, ¶ 34 (6th Dist.); *see also Doerman v. Doerman,* 2002-Ohio-3165, ¶ 35 (12th Dist.) ("From the inception of this case, Mrs. Doerman was unable to see how her anger and rage at Mr. Doerman affected the children's relationship with their father."). Far too often, children in divorce cases live out this "recurring and regrettable tragedy." *In re Custody of Harris*, 2006-Ohio-3649, ¶ 10 (2d Dist.). Ohio courts have recognized that in divorce cases

> children have certain rights, including ""the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important . . . the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles."""

*In re D.M.,* 2011-Ohio-3918, ¶ 30 (12th Dist.), quoting *Harris* at ¶ 11, quoting *Bell v. Bell*, 1998 Ohio App. LEXIS 2373, *2 (2d Dist. June 5, 1998), quoting *Thomas v. Freeland*, 1997 Ohio App. LEXIS 4545, *8 (2d Dist. Oct. 10, 1997). It was reasonable for the trial court to consider these familial dynamics in its analysis of Father's parenting time and the children's best interests.

**{¶47}** We hold that the trial court's mistaken reliance on R.C. 3109.04(F) was harmless. The trial court's findings track the relevant best-interest factors under R.C. 3109.051(D) and are supported by the evidence at the hearing. Considering those findings, it was reasonable to deny Mother's motion and find that extending Father's parenting was in the children's best interest. We overrule the first assignment of error.

**B.** ***The trial court gave Mother notice of the parenting-time hearing and properly imposed a temporal limitation on Mother's evidence***

**{¶48}** In her second assignment of error, Mother argues that the trial court's allegedly last-minute change in the scope of the hearing limited her ability to prepare to argue her motion to modify Father's parenting time. She also claims that the trial court erred when it restricted her ability to cross-examine Father at the hearing. It appears that she contends these errors violated her due-process rights.

**{¶49}** The right to due process safeguards the "'"opportunity to be heard at a meaningful time and in a meaningful manner."'" *Ijakoli v. Alungbe*, 2022-Ohio-2423, ¶ 31 (1st Dist.), quoting *In re Raheem L.,* 2013-Ohio-2423, ¶ 6 (1st Dist.), quoting *Morrison v. Warren*, 375 F.3d 468, 475 (6th Cir. 2004), citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The right to be heard in a meaningful manner "includes an opportunity to present evidence." *Id.* The right to be heard also embraces "'a reasonable opportunity to know the claims of the opposing party and to meet them.'" *Althof v. Ohio State Bd. of Psychology*, 2007-Ohio-1010, ¶ 19 (10th Dist.), quoting

*Morgan v. United States*, 304 U.S. 1, 18 (1938).

1. *Mother had notice of the hearing*

**{¶50}** Mother maintains that she had no notice that her motion to modify Father's parenting time would be heard during the February 2024 hearing. She is correct that the trial court's December 2023 scheduling order suggests that child support was the focus of that hearing.

**{¶51}** But after Mother requested a 60-day continuance for the February 2024 hearing, the trial court issued an order denying her request and informing the parties that the hearing would address Father's "continued parenting time." That order was entered more than two weeks before the February hearing and roughly eight months after Mother moved to modify Father's parenting time. Mother had ample notice of the subject of the hearing and had an opportunity to prepare her case. *See Akroyd v. Akroyd*, 2024-Ohio-4631, ¶ 21 (3d Dist.) (holding that the mother's due-process rights were not violated because she "was fully aware of the nature of the pending motions and purpose of the hearing").

2. *Mother was afforded an opportunity to be heard*

**{¶52}** Next, Mother argues that she was denied the opportunity to present "all evidence and argument[s] that she deemed important." In other parts of her brief, she asserts that she was denied an "opportunity to reference the felony convictions in Hamilton County, Ohio, and Father's thirty-month prison sentence for B1301934," which she claims are admissible under Evid.R. 609. And when Mother attempted to introduce evidence of events "in the last five years" at the hearing, the trial court told her that events more than two years old were irrelevant.

a.     Trial courts exercise broad discretion over evidentiary issues

**{¶53}** The trial court has "broad discretion over the . . . exclusion of evidence, and to reverse a decision to exclude evidence we must find an abuse of discretion and proof of material prejudice." *Ijakoli,* 2022-Ohio-2423, at ¶ 26 (1st Dist.).

**{¶54}** Evidence of a conviction is admissible in the limited circumstances identified in Evid.R. 609. Relevant here, a witness's credibility may be attacked with "evidence that the accused has been convicted of a crime . . . if the crime was punishable by death or imprisonment in excess of one year . . . and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 609(A)(2). A witness's credibility may also be attacked with "evidence that any witness, including an accused, has been convicted of a crime . . . if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance." Evid.R. 609(A)(3).

**{¶55}** Evid.R. 609(A)(2) and (3) are "subject to Evid.R. 403(B)." Under Evid.R. 403(B), the trial court has discretionary authority to exclude relevant evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B). Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Cumulative evidence "'is additional evidence of the same kind to the same point.'" *Holman v. Shiloh Grove Ltd. Partnership*, 2016-Ohio-2809, ¶ 16 (10th Dist.), quoting *Smith v. Chatwood*, 1990 Ohio App. LEXIS 3493 (2d Dist. Aug. 15, 1990).

b.      The trial court did not abuse its discretion

**{¶56}** The trial court informed Mother that it had reviewed the entire record, which includes a 2013 objection to the magistrate's decision in which Mother attached a sentencing transcript from Father's criminal case for violating a protection order and provides details of Father's tampering-with-evidence conviction. The record also includes the 2022 domestic-violence charges involving Father's current fiancée and brother, which allegedly happened in the presence of his children. The trial court specifically assured Mother that the court was aware of Father's criminal record and protection orders against Father.

**{¶57}** Allowing Mother to introduce evidence of Father's 2013 convictions would have been cumulative to the evidence in the record with which the trial court had familiarized itself. The trial court reasonably excluded Mother's evidence under Evid.R. 403(B).

**{¶58}** Also, Mother and Father had entered an agreed order in October 2022 reinstating Father's parenting time and allowing the possibility of unsupervised parenting time. Under similar circumstances, an Ohio court upheld a trial court's decision limiting evidence to events that occurred after the parties entered into a parenting-time agreement. *See Kimerle v. Griglia,* 2017-Ohio-7709, ¶ 29 (7th Dist.) ("Considering there was a court ordered supervised visitation order, and Appellant agreed to a graduated schedule going from supervised to unsupervised weekend visitation despite Appellee's history, it was fair for the court to limit the evidence to only events that occurred after April 21, 2016."). Mother agreed to Father exercising supervised parenting time with the possibility of unsupervised parenting time, despite Father's criminal history. The record suggests that since 2022, Father has not incurred additional criminal charges. And, in the words of the children, Father is "behaving."

**{¶59}** In sum, the trial court provided proper notice of the topic of the February 2022 hearing and did not abuse its discretion in excluding evidence of Father's criminal charges. We overrule the second assignment of error.

### C. *The trial court properly admitted the GAL's testimony*

**{¶60}** In Mother's third assignment of error, she argues that the trial court abused its discretion by permitting the GAL to testify at the hearing and recommend additional parenting time for Father. She claims that the GAL "failed to competently perform her duties pursuant to Superintendence Rule 48."

**{¶61}** Mother did not object to the GAL's testimony at the hearing and has not raised a plain-error argument. We have held that, "Where the appellant in a civil case does not properly invoke the plain-error doctrine, [she] cannot meet [her] burden on appeal and we will not sua sponte undertake a plain-error analysis on [her] behalf." *See Cable Busters, LLC v. Mosley,* 2020-Ohio-3442, ¶ 8 (1st Dist.). Because Mother failed to develop a plain-error argument, she has "forfeited the right to plain-error review on appeal." *Id.* at ¶ 9. We overrule Mother's third assignment of error.

### III.   Conclusion

**{¶62}** We overrule Mother's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.