[Cite as *Kuchera v. Pfalzgraf*, 2026-Ohio-1218.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| BENJAMIN JOHN KUCHERA, | : | APPEAL NO.   C-250453 |
| | | TRIAL NO.     DR-1900327 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| JESSIE ELLEN PFALZGRAF, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, appellant's brief, and appellant's argument.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/3/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *Kuchera v. Pfalzgraf*, 2026-Ohio-1218.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


BENJAMIN JOHN KUCHERA,            :            APPEAL NO.    C-250453
                                               TRIAL NO.     DR-1900327
    Plaintiff-Appellee,          :

  vs.                                :
                                                    *O P I N I O N*
JESSIE ELLEN PFALZGRAF,           :

    Defendant-Appellant.         :


Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 3, 2026


*Wagner & Bloch, LLC*, and *Deborah L. McPartlin*, for Defendant-Appellant.

**CROUSE, Presiding Judge.**

{¶1} Defendant-appellant Jessie Pfalzgraf appeals from the trial court's judgment overruling her objections to and adopting a magistrate's decision that granted plaintiff-appellee Benjamin Kuchera's motion to modify parenting time and granted in part Pfalzgraf's motion for contempt.

{¶2} In four assignments of error, Pfalzgraf challenges the trial court's modification of the parties' parenting-time schedule, failure to find Kuchera in contempt for multiple violations of the parties' shared-parenting plan, failure to award her reasonable attorney fees, and order that she pay half of the guardian ad litem's ("GAL's") outstanding fees.

{¶3} Following our review of the record, we find Pfalzgraf's arguments to be without merit and affirm the trial court's judgment.

## I. Factual and Procedural History

{¶4} Kuchera and Pfalzgraf were married in 2008 and granted a decree of divorce in June 2021. The decree incorporated a shared-parenting plan that governed the parties' care of their three minor children. The shared-parenting plan provided that the parents shared physical and legal custody of the children, and it included the following rotating two-week schedule of parenting time:

|  | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Week 1 | Mother | Father | Father | Mother | Mother | Mother | Mother |
| Week 2 | Mother | Father | Father | Mother | Father | Father | Father |

{¶5} The shared-parenting plan further provided a holiday and summer schedule of parenting time. The summer schedule alternated parenting time between Kuchera and Pfalzgraf on a weekly basis.

{¶6} In August 2023, Pfalzgraf discovered that one of the parties' minor children, C.K., had been cutting himself. Then, on October 25, 2023, Kuchera found a

3

suicide note in C.K.'s room blaming Pfalzgraf for C.K.'s distress. C.K. was admitted to Cincinnati Children's Hospital, and then to the Lindner Center. He was subsequently discharged into Pfalzgraf's care on November 2, 2023, as this was one of her scheduled parenting days. Per the terms of the shared-parenting plan, C.K. switched to Kuchera's care the following day. Citing concerns for C.K.'s safety, Kuchera refused to return C.K. to Pfalzgraf's care from that date on.

{¶7}   While C.K. was at the Lindner Center, Kuchera filed a motion to modify the parties' parenting-time schedule as it pertained to C.K. The motion argued that there had been a change in circumstances and that it was in C.K.'s best interest to remain in Kuchera's full-time care. Kuchera also filed a motion to appoint a GAL for C.K. The trial court appointed Erinn McKee Hannigan, who had served as the GAL for C.K. and his siblings during their parents' divorce.

{¶8}   In January 2024, while Kuchera's motion to modify parenting time was pending, a magistrate issued an order providing for twice-weekly phone calls between Pfalzgraf and C.K. In March 2024, the magistrate issued an order providing that Pfalzgraf and C.K. should participate in therapy together, that their phone calls should continue, and that they should begin having scheduled dinners together, per the GAL's recommendation.

{¶9}   On April 25, 2024, Pfalzgraf filed a "motion for contempt and other relief." The motion alleged that Kuchera was in contempt for violating various provisions of the parties' shared-parenting plan and court orders by (1) failing to return C.K. to Pfalzgraf's custody after November 3, 2023, (2) withholding C.K. from Pfalzgraf on specific, scheduled parenting days that were listed in an attachment to the motion, (3) withholding C.K. from Pfalzgraf on her holiday parenting time, (4) failing to monitor use of the children's devices and failing to provide Pfalzgraf logins and

passwords to websites used by the children, (5) blocking Pfalzgraf from calling and texting C.K., (6) failing to pay child support, (7) failing to set up a wage-deduction order for purposes of child support, (8) unilaterally making all decisions with respect to C.K.'s physical and mental health since November 2, 2023, (9) discontinuing C.K.'s mental-health care after six visits following his discharge from the Lindner Center, and (10) attending C.K.'s telehealth visits with his mental-health-care provider.

{¶10} Pfalzgraf's motion also requested, as relevant to this appeal, that she be relieved from paying any costs associated with the GAL and that the court award her attorney fees.

{¶11} The GAL filed several motions for payment of fees. The most recent motion stated that she had incurred approximately $7,542.50 in outstanding fees, and that Kuchera had already paid her $3,550.

{¶12} A hearing was held on the various motions on September 25, 2024, and January 22, 2025.

### A. Hearing Testimony

#### 1. Parents

{¶13} Kuchera testified that, in the fall of 2023, he noticed that C.K. had become increasingly withdrawn and learned from Pfalzgraf that C.K. had been cutting himself. Kuchera testified that he subsequently found a suicide note in C.K.'s room stating that C.K. planned to hurt himself due to stress caused by Pfalzgraf. After finding the note, Kuchera took C.K. to Children's Hospital. Kuchera testified that he notified Pfalzgraf of C.K.'s hospitalization via Our Family Wizard ("OFW"), an application that the court had previously required the parties use to communicate after Pfalzgraf obtained a protection order against Kuchera.

{¶14} Kuchera explained that C.K. was subsequently admitted to the Lindner

5

Center, where a safety plan was implemented. The plan involved eliminating all "sharps" and anything that could be a hanging risk from the parties' homes. Kuchera testified that he had concerns about releasing C.K. into Pfalzgraf's care because she had a history of emotionally, physically, and sexually abusing their children. C.K. was nonetheless released on one of Pfalzgraf's scheduled parenting days and into her care. Kuchera stated that he saw C.K. the day after his release and that C.K. appeared "sunk deep within himself" and looked worse than he had during inpatient treatment.

{¶15} Kuchera's testimony addressed an incident that occurred when Pfalzgraf attempted to pick C.K. up from school following C.K.'s hospitalization. According to Kuchera, he received a text from C.K. after C.K. learned that Pfalzgraf had arrived to pick him up. In response to the text, Kuchera told C.K. that he should remove himself from the situation if he was in fear of his safety. C.K. then fled the school. Kuchera explained that C.K. "became a wreck about going to school" because he was fearful about "being ambushed by his mother." Kuchera testified that C.K. began attending school more consistently after the GAL was appointed and they received a recommendation that C.K. stay in Kuchera's care.

{¶16} Kuchera's testimony addressed his strong belief that C.K. should remain in his care. He stated that Pfalzgraf viewed her love for the children as "romantic," rather than "maternal." And he stated that "when the children are distressed [Pfalzgraf's] lack of boundaries and sexual behavior towards the kids get spiked." Kuchera also testified about C.K.'s sleep issues. He stated that the issues largely resolved after C.K. was diagnosed with ADHD and began taking medication.

{¶17} The testimony offered by Kuchera addressed various allegations that Pfalzgraf had made in her motion for contempt. He discussed his monitoring of the children's electronic devices and testified that he turns off the internet at his house at

midnight so that the children cannot access it. And he stated that while he does not monitor C.K.'s text messages, he is aware of what websites C.K. visits and has conversations with C.K. about internet use. Kuchera acknowledged that there have been slipups in this regard, but that he believes he handles device- and internet-related issues responsibly and safely. In response to Pfalzgraf's allegation that he had blocked her from calling and texting C.K., Kuchera testified that C.K. had been bothered by Pfalzgraf's "micromanaging" of his time while he was under Kuchera's care. He stated that he told C.K., "you know, it's your phone," and that he believes there were times when C.K. blocked Pfalzgraf. Kuchera acknowledged that he was in arrearages on his child-support obligations, explaining that he has experienced periods of unemployment since the parties' divorce. On cross-examination, he conceded that he made no child-support payments from November 28, 2023, until June 17, 2024.

{¶18} Kuchera's testimony also addressed the steps taken to reintroduce Pfalzgraf into C.K.'s life after C.K. began living permanently with Kuchera, including weekly phone calls and dinners. Kuchera testified that C.K. was not happy when the phone calls were initiated, but that he was willing to participate. Kuchera testified that he was not comfortable with Pfalzgraf receiving make-up parenting time for the time that she had missed with C.K. He also stated that he had filed a petition for a Domestic Violence Civil Protection Order ("DV CPO") against Pfalzgraf on November 16, 2023, but that his request for an ex parte protection order was denied and that he had subsequently dismissed the petition.

{¶19} Kuchera was questioned on cross-examination about his use of various medications. He testified that he takes both ketamine and medical marijuana, which he stores in a lockbox in his closet. Kuchera stated that he does not take ketamine when the children are present, and that he takes the medical marijuana in the evening

after they are asleep. He testified that his current mental-health diagnoses were anxiety, depression, insomnia, and complex PTSD. The cross-examination of Kuchera also addressed his concerns with how Pfalzgraf transported C.K.'s medications from one parent's house to the other's. He accused Pfalzgraf of forcing C.K. to "smuggle" his medication through school.

{¶20} Pfalzgraf also provided extensive testimony. Her testimony, offered on the second day of the hearing, provided that Kuchera's child-support arrearage was $8,934.20 when the hearing began in September 2024. She stated that he had made a lump-sum payment of approximately $7,000 towards his arrearage after the first court date, but that he had made no additional payments in the subsequent four months. Pfalzgraf testified that Kuchera had not set up a wage-deduction order and explained that she was uncomfortable receiving lump-sum payments because it put her receipt of food stamps and Medicaid benefits at risk. Pfalzgraf testified that she was unemployed, that she had no ability to pay attorney fees or the GAL fees, and that maternal grandfather was paying her attorney fees.

{¶21} Pfalzgraf testified that C.K. had not experienced mental-health issues prior to August 2023, when she noticed cuts on his arms for the first time. When she questioned C.K., he said that he had cut himself with a knife while at Kuchera's house and that he had not been trying to kill himself. Pfalzgraf immediately scheduled an appointment with C.K.'s pediatrician, during which a safety plan was implemented. Pfalzgraf notified Kuchera about the cutting via OFW. She sent him a photograph of the safety plan and asked him to remove all "sharps" from his house.

{¶22} Pfalzgraf testified that C.K. was prescribed Prozac after she discovered the cutting. When she communicated this to Kuchera, he told her that he did not want C.K. to take the medication until he spoke to the pediatrician. Pfalzgraf's testimony

established that it took Kuchera approximately six weeks to approve the medication, and that C.K. went without the medication during that time period. Pfalzgraf testified that C.K.'s dose was later increased, and that when she notified Kuchera of the increase, he responded that the change had been made without his consent.

{¶23} Pfalzgraf explained that Kuchera did not have medication for C.K. at his house. She stated that she was uncomfortable sending C.K. to school with a bottle of Prozac on the days that he transitioned to Kuchera's home, so she packed the requisite number of pills for his time there and put them in C.K.'s backpack. Pfalzgraf testified that C.K.'s counselor at the time was aware that he carried medication, but that Kuchera accused her of placing C.K. at risk both legally and medically by making him smuggle unlabeled drugs through school. Kuchera messaged Pfalzgraf that he had obtained a second prescription for the medication to keep at his home. But Pfalzgraf testified that Kuchera never filled the prescription, and that C.K. had no medication at Kuchera's house from mid-October 2023 until the time of his hospitalization.

{¶24} Pfalzgraf testified that when C.K. was hospitalized, Kuchera told the hospital that she was a danger to C.K. and she was not allowed to see C.K. until she spoke to a social worker. Pfalzgraf stated that she was unaware that C.K. did not feel safe in her home, and she explained that most of her conflict with C.K. concerned his homework. She testified that she learned from staff at the Lindner Center that Kuchera had threatened to discharge C.K. against medical advice to prevent him from being released into her care.

{¶25} Pfalzgraf testified that Kuchera stopped following the shared-parenting plan on November 3, 2023, and that he contacted the Hamilton County Department of Job and Family Services ("HCJFS") to report her as a danger to C.K. She stated that she also contacted HCJFS to request an investigation, and that, following the

investigation, it was determined that the allegations against her were unsubstantiated.

{¶26} Pfalzgraf testified that she has seen C.K. a total of 24 hours since November 3, 2023, and that C.K. missed 32 days of school during the 2023-2024 school year. She stated that she had opposed the appointment of a GAL, while noting that the GAL's report did not include any allegations that she was a danger to C.K. either physically, mentally, or sexually. Pfalzgraf explained that she had agreed to stop picking C.K. up from school after Kuchera twice alleged that she attempted to abduct him.

{¶27} Pfalzgraf testified that, in the time period between the two court hearings, C.K. has spent time with her and slept at her house. She stated that several of her scheduled dinners with C.K. had not taken place, and that Kuchera had failed to consistently bring C.K. to their scheduled drop-off location.

{¶28} Pfalzgraf testified about additional allegations in her motion for contempt. With respect to her assertion that Kuchera blocked her from calling and messaging C.K., she testified that Kuchera sent her an OFW message stating that, to maintain boundaries between their houses, he was changing the "permissions" on C.K.'s phone. The message said that if she wanted to speak to C.K., she could reach out to Kuchera and he would set up a time for her to chat with him. With respect to her allegation that Kuchera failed to provide her with passwords and login information, she testified that Kuchera had provided C.K. with a second cell phone for which she had the passcode, but that she was unable to access C.K.'s gaming laptop. With respect to her allegation that Kuchera unilaterally made medical decisions for C.K., Pfalzgraf explained that Kuchera had taken C.K. to be evaluated for ADHD and allowed him to take medication for that diagnosis without informing her.

*2. The GAL*

**{¶29}** Hannigan, the GAL for C.K., testified that she has a very good relationship with C.K., and that she has known the family since the end of 2019. Her testimony touched on the inability of Kuchera and Pfalzgraf to communicate. She stated that both parents had unilaterally scheduled doctor's appointments for the children without notifying each other. With respect to C.K.'s questionable school attendance, Hannigan stated that part of the reason C.K. refused to go to school was because of Pfalzgraf's attempts to pick him up. She testified that she spoke to Kuchera about his failure to send C.K. to school and that she "was not kind" in her conversation with him. She also stated that Kuchera was reported for educational neglect, but that it was "unknown if anything came of that."

**{¶30}** Hannigan testified about the report she issued in this case and her various recommendations. She stated that it was in C.K.'s best interest to gradually increase contact with Pfalzgraf, rather than place him with her 100 percent of the time or award Pfalzgraf makeup parenting time. She accordingly recommended a two-month phase-in period in which C.K. and Pfalzgraf would see each other on a more consistent basis, with the ultimate goal of Pfalzgraf parenting C.K. each Monday, including overnight, and every other weekend. She also recommended that Pfalzgraf and C.K. see a therapist or parenting coach together. Hannigan felt that a return to the original schedule of parenting time would "send [C.K.] down a rabbit hole" because he finds his relationship with Pfalzgraf to be intense and triggering.

**{¶31}** Hannigan's additional recommendations included that each parent have access to a program or application to monitor C.K.'s location; that both parents have C.K.'s social-media-login information; that, when disciplining C.K., the parents block smart-phone applications rather than take away the actual phone; that the

parents implement a process for the exchange of medicine; that decisions about C.K.'s activities on any given day be made by the parent assigned that parenting time; that C.K. reengage with his therapist; and that a parenting coordinator be appointed. She also testified that her investigation did not support the accusation that one parent had blocked the other from C.K.'s phone, and that it was entirely possible that C.K. had blocked Pfalzgraf's calls himself.

{¶32} Hannigan testified that she last spoke to C.K. in late August or early September 2023, which was within 14 days of when her report was issued. She testified that she perceived C.K. to be in a much better place emotionally and educationally. Hannigan last testified about the fees that she had accrued serving as GAL.

### 3. Medical Professionals and School Counselor

{¶33} Dr. Michael Sorter, a child and adolescent psychiatrist, testified that he treated C.K. while C.K. was at the Lindner Center. Dr. Sorter stated that C.K. never disclosed any abuse by Pfalzgraf, and that while C.K. vocalized anger towards her at the beginning of his hospitalization, he was willing to work with Pfalzgraf towards the end. At the time of C.K.'s discharge, Dr. Sorter was not worried that Pfalzgraf posed a danger to him.

{¶34} Hannah Frey, a social worker at the Lindner Center, testified that she helped create C.K.'s safety plan. She stated that she was aware that Kuchera had not wanted C.K. discharged to Pfalzgraf and that Kuchera had asked about discharging C.K. against medical advice. She testified that C.K.'s triggers were Pfalzgraf and knives.

{¶35} Renita Brooks, C.K.'s school counselor at the time of the hearing, testified regarding the incident in which C.K. left the school after learning that Pfalzgraf would pick him up. Brooks testified that she had received emails from Kuchera stating that Pfalzgraf had tried to abduct C.K. and that he would not send C.K.

to school to keep him safe from Pfalzgraf. Brooks stated that, based on her contact with Pfalzgraf, she found no truth to Kuchera's allegations and that she had no concern about Pfalzgraf abusing C.K. Brooks further testified that Pfalzgraf told her that she would allow Kuchera to pick up C.K. from school on her scheduled parenting days because she did not want to cause any stress for C.K.

### B. Magistrate's Decision

{¶36} The magistrate issued a decision granting Kuchera's motion to modify parenting time. The decision included the magistrate's findings under the factors in R.C. 3109.04(F)(1) and her determination that it was in C.K.'s best interest to modify parenting time in accordance with the GAL's recommendation. She accordingly modified the parenting time of C.K. to reflect the following schedule:

|         | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---------|--------|---------|-----------|----------|--------|----------|--------|
| Week 1  | Mother | Father  | Father    | Father   | Mother | Mother   | Mother |
| Week 2  | Mother | Father  | Father    | Father   | Father | Father   | Father |

{¶37} The decision provided that this schedule should be followed year-round "and shall not change to the week-on, week-off schedule during the summer as they have done in the past." It included various additional recommendations that the GAL had made in her report regarding C.K.'s electronic devices, therapy, and medication.

{¶38} The magistrate granted Pfalzgraf's motion for contempt in part and found Kuchera in contempt for failing to pay child support. The decision stated that Kuchera could purge himself of contempt by paying $2,000 into the child-support account, paying all monthly child-support payments from the date of the decision until the date of a scheduled sentencing hearing on the contempt, setting up a wage-deduction order, and paying Pfalzgraf $500 towards her attorney fees. The magistrate stated that she found the remainder of the allegations in the motion for contempt to be not well-taken and denied them.

{¶39} The magistrate's decision also granted the GAL's motion for payment of additional fees and provided that Kuchera and Pfalzgraf were to each pay $3,771.25 towards the GAL's remaining fees.

### C. Pfalzgraf's Objections

{¶40} Pfalzgraf filed objections to the magistrate's decision. She first contended that the magistrate's determination that a modification of parenting time was in C.K.'s best interest was against the weight of the evidence. In support of this objection, she argued (1) that the magistrate improperly relied on R.C. 3109.051(D), instead of R.C. 3109.04(E), when determining C.K.'s best interest, (2) that the magistrate erred in failing to consider R.C. 3109.04(F)(2) and in finding that R.C. 3109.04(F)(1)(h) and (i) were not applicable, (3) that the magistrate disregarded the testimony of Dr. Sorter, Hannah Frey, and Renita Brooks, and (4) that the modified parenting schedule eliminated her vacation parenting time, holiday parenting time, and C.K.'s time with his siblings.

{¶41} Pfalzgraf raised three additional objections contending that the magistrate erred in failing to find Kuchera in contempt for multiple violations of the shared-parenting plan, that the magistrate abused her discretion by failing to award Pfalzgraf her reasonable attorney fees, and that the magistrate abused her discretion in ordering Pfalzgraf to pay half of the GAL's outstanding fees.

### D. Trial Court's Decision

{¶42} The trial court issued a decision overruling Pfalzgraf's objections and adopting the decision of the magistrate.

{¶43} Pfalzgraf now appeals. Kuchera has not filed an appellate brief or otherwise participated in this appeal.

### *II. Modification of Parenting Time*

**{¶44}** In her first assignment of error, Pfalzgraf argues that a modification of the parenting-time schedule was not in C.K.'s best interest.

**{¶45}** A trial court has broad discretion when ruling on a motion to modify parenting time, and its decision on such a matter will not be reversed absent an abuse of discretion. *Tyra v. Griffith*, 2025-Ohio-912, ¶ 40 (1st Dist.). An abuse of discretion occurs when "a court exercise[s] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. It implies that the trial court's attitude is arbitrary, unreasonable, or unconscionable. *Gipson v. Mercy Health Sys. of S.W. Ohio*, 2025-Ohio-2208, ¶ 12 (1st Dist.). Under this deferential standard of review, an appellate court may not substitute its judgment for that of the trial court. *Id.* When reviewing a trial court's decision on parenting time, "we defer 'to the trial court's factual findings because it is better situated to judge the credibility of the witnesses and the weight to be given the testimony and evidence.'" *Tyra* at ¶ 40, quoting *Hagan v. Hagan*, 2019-Ohio-51, ¶ 45 (5th Dist.).

**{¶46}** A motion to modify parenting time shall not be granted unless the court finds that a change of circumstances has occurred and that a modification is in the best interest of the child. R.C. 3109.04(E)(1)(a). In determining whether a modification of parenting time is in the child's best interest, the trial court shall consider "all relevant factors, including, but not limited to," those set forth in R.C. 3109.04(F)(1).

### *A. R.C. 3109.04*

**{¶47}** Pfalzgraf first argues that the magistrate erred as a matter of law by citing R.C. 3109.051(D) in the decision, rather than R.C. 3109.04(F). The latter statute applies in the case at bar, as it sets forth factors to be considered "on an original decree

15

allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities." The former statute sets forth factors to be considered in determining whether to grant parenting time to a parent or to grant companionship or visitation rights to a third party.

**{¶48}** Pfalzgraf raised this same argument in one of her objections to the magistrate's decision. In denying the objection, the trial court found that the magistrate's reference to R.C. 3109.051(D) was a clerical error and that the magistrate had considered the appropriate factors in R.C. 3109.04. We agree, as a reading of the magistrate's decision in its entirety demonstrates that the correct statute was considered.

**{¶49}** First, when setting forth her findings of fact, the magistrate made findings under the factors in R.C. 3109.04(F)(1). Second, when setting forth the relevant law, the magistrate stated that the factors in R.C. 3109.04(F)(1) must be considered. The magistrate did, as Pfalzgraf contends, mistakenly state in a later portion of the opinion that she had considered the factors in R.C. 3109.051(D). But the magistrate's *actual application* of the factors in R.C. 3109.04(F) establishes that this reference to R.C. 3109.051(D) was nothing more than a clerical error.

### B.  Failure to Properly Consider Domestic Violence

**{¶50}** Pfalzgraf contends that the magistrate failed to properly consider the domestic violence committed by Kuchera when determining whether a modification of the parenting-time schedule was in C.K.'s best interest. In support of this argument, she argues that the magistrate erred in failing to consider R.C. 3109.04(F)(2) and in finding that R.C. 3109.04(F)(1)(h) was not applicable.

**{¶51}** R.C. 3109.04(F)(2) provides that, when "determining whether shared parenting is in the best interest of the children," the factors set forth in subdivision

(F)(2)(a) through (e) shall be considered. Specifically, R.C. 3109.04(F)(2)(c) provides that the court shall consider "[a]ny history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent." It is this particular factor that Pfalzgraf believes should have been considered.

{¶52} R.C. 3109.04(F)(1)(h) also addresses domestic violence, providing that the trial court shall consider

> [w]hether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a

17

neglected child . . . .

**{¶53}** In overruling Pfalzgraf's objection on these grounds, the trial court found no error in the magistrate's failure to apply the factors in R.C. 3109.04(F)(2) because that section of the statute only applied when a magistrate was determining whether shared parenting was in a child's best interest. The trial court was correct. Because the magistrate was determining whether the parties' parenting-time schedule should be modified, and not whether shared parenting was in C.K.'s best interest, R.C. 3109.04(F)(2) was not applicable.

**{¶54}** With respect to Pfalzgraf's argument regarding R.C. 3109.04(F)(1)(h), the trial court found no error in the magistrate's determination that this factor was not applicable because no evidence was presented that either parent had been convicted of or pled guilty to a criminal offense committed against the other parent or a child. We ultimately agree that magistrate did not err in failing to consider this factor, although we find the trial court's analysis to be incomplete.

**{¶55}** R.C. 3109.04(F)(1)(h) required the magistrate to consider not only whether a parent had been convicted of or pled guilty to certain offenses, but also whether "either parent has acted in a manner resulting in a child being an abused child or a neglected child." Testimony from Hannigan established that Pfalzgraf had previously obtained a DV CPO against Kuchera and that the parties' children had been listed as protected parties in the order. This information was certainly relevant to determining whether Kuchera had acted in a manner that resulted in C.K. being an abused or neglected child. However, the DV CPO was not admitted into evidence and no testimony was offered regarding the specific behavior by Kuchera that resulted in

the order.[1] Hannigan further testified that the abuse that occurred in the parties' home around the time of their divorce and the time that the DV CPO was obtained, was "not applicable to what we're dealing with now."

**{¶56}** Given the dearth of evidence in the record shedding light on Kuchera's history of domestic violence and its impact on C.K., as well as the fact that Kuchera had not been convicted of or pled guilty to any of the offenses described or listed in R.C. 3109.04(F)(1)(h), we find no error in the magistrate's determination that this factor was not applicable. We accordingly find no merit to Pfalzgraf's argument that the magistrate failed to properly consider domestic violence committed by Kuchera when determining whether a modification of parenting time was in C.K.'s best interest.

### C. Withholding of Court-Ordered Parenting Time

**{¶57}** Pfalzgraf next argues that the magistrate and trial court failed to properly consider Kuchera's withholding of court-ordered parenting time from Pfalzgraf in accordance with R.C. 3109.04(F)(1)(f) and (i).

**{¶58}** R.C. 3109.04(F)(1)(f) provides that the court shall consider which parent is "more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights." And R.C. 3109.04(F)(1)(i) provides that it shall consider "[w]hether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court."

**{¶59}** When discussing the factor set forth in R.C. 3109.04(F)(1)(f), the magistrate noted the GAL's belief that it was C.K.'s own desire, rather than Kuchera's influence, that C.K. reside with Kuchera and not return to Pfalzgraf's care. The trial

---

[1] While Pfalzgraf's written closing arguments discussed the domestic violence in more detail, closing arguments are not evidence. *See State v. Rodriguez*, 2025-Ohio-53, ¶ 48 (1st Dist.).

court elaborated on this finding when discussing whether Kuchera should be found in contempt for withholding parenting time. The court found that that Pfalzgraf had been identified as a "trigger" for C.K., that she and C.K. have a "challenging dynamic," and that "it was C.K. [and] not father who was choosing to avoid mother."

**{¶60}** On this record, we cannot find that either the magistrate or the trial court failed to properly consider whether Kuchera had withheld parenting time from Pfalzgraf.

### D.  Reliance on the GAL's Recommendation

**{¶61}** Pfalzgraf additionally contends that the trial court improperly relied on the GAL's recommendation without statutory authority. She argues that R.C. 3109.04(F)(1)(b) provides that the "wishes and concerns" of the child may only be considered if the court conducts an in camera interview, and not through a GAL's recommendation. Pfalzgraf correctly notes that R.C. 3109.04(F)(1)(b) allows the trial court to consider the wishes and concerns of a child expressed to the court during an in camera interview. But it does not expressly limit the trial court's consideration of a child's wishes to only those circumstances.

**{¶62}** R.C. 3109.04(F)(1) provides that, when determining what is in a child's best interest, the court shall consider "all relevant factors, including, *but not limited to*," those specified in (F)(1)(a) through (j). (Emphasis added.) The trial court was therefore within its authority to consider the report and recommendation of the GAL, which was undeniably relevant, particularly given the GAL's longstanding involvement with the family.

### E.  Impact of Modification on Extended and Holiday Time

**{¶63}** Pfalzgraf's next argument pertains to the best-interest factor set forth in R.C. 3109.04(F)(1)(c), which provides that the court shall consider "[t]he child's

interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest." She argues that the trial court's modification of the parenting-time schedule for C.K. was not in his best interest because the modification of the parties' summer schedule eliminated her holiday, extended, and vacation time with him, as well as her ability to vacation with all her children together. We address each contention in turn.

**{¶64}** As the trial court correctly found when ruling on Pfalzgraf's objection to the magistrate's decision, the modification of the parenting-time schedule with respect to C.K. did not impact either parent's holiday time with him. The shared-parenting plan provided that, in determining the precedence for parenting time, holiday time took priority. Therefore, Pfalzgraf's holiday time will not be eliminated by the modification to the parties' schedule.

**{¶65}** The trial court likewise found Pfalzgraf's argument about the impact of the parenting-time modification on her vacation and extended time with C.K. to be without merit. It stated,

> As for extended time, the parties' Shared Parenting Plan does not have any provisions for specific extended time. The Court declines to order an extended parenting time provision at this time given the need to monitor the child's progress in therapy with Mother and Mother's parenting time. The parties are free to incorporate a provision for extended time by agreement or by filing a motion and requesting a Court Order.

Given the language of the parties' shared-parenting plan, we agree with the trial court's explanation and resolution of Pfalzgraf's objection.

**{¶66}** The shared-parenting plan provided that "[t]he parents do not have any

specific extended time. The parents agree to travel with the children during his or her regular parenting time schedule." The plan did not specifically provide for vacation time. A vacation with all children was feasible under the original shared-parenting plan, when the parties employed a week-on/week-off schedule in the summer. But under the modified parenting-time schedule, while Pfalzgraf will continue to parent the other two minor children on this week-on/week-off schedule, she will only parent C.K. on Mondays and every other weekend. As Pfalzgraf argues, this likely eliminates her ability to take C.K. on vacation with his siblings.

**{¶67}** The trial court was not unsympathetic to Pfalzgraf's argument, but it recognized that it was necessary to monitor C.K.'s progress during parenting time with Pfalzgraf before awarding her vacation or extended time. And it explained that Pfalzgraf could always seek a modification of the shared-parenting plan to be awarded such time. We find no error in the trial court's determination, and we hold that the modification to the parenting-time schedule was not against C.K.'s best interest because of its impact on any extended or vacation time with Pfalzgraf.

### F. Failure to Properly Weigh the Evidence

**{¶68}** Pfalzgraf's remaining two challenges to the trial court's best-interest determination concern the weight of the evidence. She argues that the trial court disregarded the testimony of Dr. Sorter, social worker Frey, and school counselor Brooks, and that the court did not properly weigh the evidence.

**{¶69}** The trial court found Pfalzgraf's objection to the magistrate's failure to consider the testimony of these three witnesses to be without merit. It first noted that the magistrate was in the best position to determine the credibility of the witnesses and weigh the evidence. It then found that the interactions of these three witnesses with C.K. and his parents was limited.

**{¶70}** Pfalzgraf's assertion that the testimony of these witnesses was "disregarded" is not accurate. The magistrate's findings of fact noted Dr. Sorter's testimony that Pfalzgraf was not a danger to C.K. and referred to Brooks's testimony regarding C.K.'s academic performance. The magistrate did not refer to or discuss Frey's testimony. But our review of the record reveals that Frey offered little testimony that was not also offered by other witnesses, and that she also could not recall the answer to several of the questions that she was asked.

**{¶71}** We agree with the trial court's assessment that these three witnesses had limited interaction with C.K. and his family, and we find no error in either the magistrate or the trial court's failure to accord more weight to their testimony.

**{¶72}** The evidence presented at the hearing established that C.K., a teenager able to express his own wishes and desires, suffered mental distress and that Pfalzgraf was a trigger for his behavior. C.K. went to great lengths to avoid time with Pfalzgraf, including running away from school and blocking her from messaging him. The record, however, also establishes that Pfalzgraf clearly loves C.K. and has a strong desire to protect his health and interests.

**{¶73}** In determining whether a modification of the parenting-time schedule was in C.K.'s best interest, the magistrate considered the relevant factors under R.C. 3109.04(F)(1). As the magistrate was in the best position to assess the credibility of the witnesses and the weight of the evidence, we defer to her factual findings absent an abuse of discretion. *See Tyra*, 2025-Ohio-912, at ¶ 40 (1st Dist.). And on this record, particularly given the complex relationship between C.K. and Pfalzgraf, we find no abuse of discretion in the determination that a modification of the parenting-time schedule was in C.K.'s best interest.

**{¶74}** Pfalzgraf's first assignment of error is overruled.

### III. Motion for Contempt

**{¶75}** In her second assignment of error, Pfalzgraf argues that the trial court abused its discretion when it failed to properly consider and rule upon her motion for contempt and failed to find Kuchera in contempt of court for multiple violations of the parties' shared-parenting plan.

**{¶76}** We review a trial court's ruling on a motion for contempt for an abuse of discretion. *Dexter v. Fairchild*, 2024-Ohio-6080, ¶ 31 (1st Dist.). A finding of civil contempt is intended to "'coerce compliance with a court order or to compensate a party damaged by noncompliance with a court order.'" *Edelstein v Edelstein*, 2025-Ohio-1514, ¶ 87 (1st Dist.), quoting *Heekin v. Silver Rule Masonry, Inc.*, 2011-Ohio-2775, ¶ 13 (1st Dist.).

**{¶77}** Pfalzgraf's motion for contempt argued that Kuchera should be found in contempt for ten separate violations of the parties' shared-parenting plan and various court orders. Kuchera was found in contempt for one of the alleged violations—failing to pay child support. Pfalzgraf now argues that the trial court erred in failing to find Kuchera in contempt for her remaining nine alleged violations.

### A. Contempt Allegations Regarding the Withholding of Parenting Time

**{¶78}** Pfalzgraf's first three allegations of contempt pertained to Kuchera's withholding of parenting time. When ruling on Pfalzgraf's objections, the trial court found no error in the magistrate's failure to find Kuchera in contempt on this ground because the evidence presented established that it was C.K., and not Kuchera, who chose to avoid parenting time with Pfalzgraf.

**{¶79}** The evidence presented at the hearing established that Pfalzgraf was a known trigger for C.K. and that C.K. purposely avoided parenting time with her. Kuchera certainly made no effort to encourage C.K. to spend time with Pfalzgraf or to

foster a mother-and-son relationship. And the advice that Kuchera imparted to C.K. regarding his relationship with Pfalzgraf was questionable at times. The most egregious example of this was his advice that if C.K. feared for his safety because Pfalzgraf had arrived to pick him from school, he should remove himself from the situation. This advice essentially encouraged C.K. to flee the school.

**{¶80}** Regardless of Kuchera's at-times questionable parenting tactics, the record supported the trial court's determination that C.K. chose to avoid parenting time with Pfalzgraf. Under these circumstances, we find no abuse of discretion in the trial court's failure to find Kuchera in contempt for withholding parenting time from Pfalzgraf.

### B. Contempt Allegations Regarding C.K.'s Devices

**{¶81}** We next address Pfalzgraf's contentions that the trial court erred in failing to find Kuchera in contempt for not providing her with login information for C.K.'s devices and for blocking her from contacting C.K.

**{¶82}** The trial court found that the record contained no convincing testimony or evidence that Kuchera failed to provide Pfalzgraf with login access to those devices or was responsible for blocking Pfalzgraf's number on C.K.'s phone. The court referred to Kuchera's testimony that he could not recall specific requests from Pfalzgraf for login information and found that "each parent has had issues with this in the past and communication overall could use improvement." The court further relied on the testimony offered by both Kuchera and the GAL that C.K. may have blocked Pfalzgraf from his phone.

**{¶83}** We find no abuse of discretion in the trial court's failure to find Kuchera in contempt on these grounds. While the record contained an OFW message from Kuchera to Pfalzgraf stating that he was going to change the "permissions" on C.K.'s

phone, no evidence was presented to establish that he followed through on that intention. To the contrary, the GAL, a neutral party, testified that it was entirely possible that C.K. himself had blocked Pfalzgraf. The trial court was well within its discretion to rely on the GAL's testimony when determining that Pfalzgraf's allegations were without merit.

### C. Allegation Regarding Wage-Deduction Order

**{¶84}** Pfalzgraf next argues that the trial court erred in failing to find Kuchera in contempt for failing to set up a wage-deduction order. She contends that Kuchera was court-ordered to set up a wage-deduction order in April 2022. As Pfalzgraf notes, the trial court failed to explicitly rule on her objection on this ground.

**{¶85}** While our record affirmatively establishes that Kuchera failed to set up a wage-deduction order, it contains no court order expressly requiring him to do so.

**{¶86}** Although Pfalzgraf argues in her appellate brief that the court order requiring Kuchera to set up a wage-deduction order was issued in April 2022, her motion for contempt alleged that the order was issued June 22, 2022. The record contains no court order requiring Kuchera to set up a wage-deduction order on that date. The record does contain an "agreed entry to modify child support" dated April 22, 2022. This entry states that, effective April 1, 2022, Kuchera agreed to pay Pfalzgraf a specified amount of child support through the Office of Child Support of the Department of Job and Family Services. The entry further states that Kuchera was responsible for making payments to the Office of Child Support "until such time as a deduction order takes effect." This entry addresses child support, but it contains no affirmative court order requiring Kuchera to set up a wage-deduction order.

**{¶87}** Further, although the trial court did not find Kuchera in contempt for failing to set up a wage-deduction order, it did find him in contempt for failing to pay

26

child support and held that the contempt could not be purged until Kuchera set up a wage-deduction order. The trial court thus accorded relief to Pfalzgraf regarding issues with the wage-deduction order. We accordingly find no abuse of discretion in the trial court's failure to find Kuchera in contempt on this ground.

### D. *Allegations Regarding Unilateral Decision Making*

**{¶88}** We last consider Pfalzgraf's argument that the trial court failed to find Kuchera in contempt for unilaterally making decisions regarding C.K. In overruling Pfalzgraf's objection on these same grounds, the trial court found that Kuchera's alleged unilateral decision-making did not rise to the level of contempt. It stated,

> Regarding the medication, Father was attempting to discuss these medications with the prescribing physician, not withhold his consent. As for school attendance, C.K. was refusing to go to school. The GAL testified that she had a stern conversation with Father about this and the issue was resolved. Overall, both parents struggle with communication related to their children as evidenced by the OFW messages in Exhibit O.

**{¶89}** The record supports the trial court's findings. The court was not blind to Kuchera's shortcomings, as evinced in its reference to the conversation that the GAL felt it necessary to have with Kuchera about C.K.'s school attendance. But the court also—appropriately—considered C.K.'s involvement in and impact on the decisions about his life that Pfalzgraf alleges were unilaterally made by Kuchera. We find no abuse of discretion in the trial court's determination that Kuchera's actions did not rise to the level of contempt.

**{¶90}** Having found Pfalzgraf's argument that the trial court erred in failing to find Kuchera in contempt for additional violations of the parties' shared-parenting

plan and court orders to be without merit, we overrule the second assignment of error.

### IV. Attorney Fees

**{¶91}** In her third assignment of error, Pfalzgraf argues that "[i]t was arbitrary, unreasonable, and against the manifest weight of the evidence for the Trial Court to fail to award Mother's reasonable attorney fees."

**{¶92}** A trial court's award of attorney fees is reviewed for an abuse of discretion. *In re Q.R.*, 2026-Ohio-341, ¶ 28 (1st Dist.). We will not interfere with the court's award of fees unless the amount awarded is either so high or so low that it shocks the conscience. *Id.* at ¶ 30.

**{¶93}** Pursuant to R.C. 3105.73(B),

In any post-decree motion or proceeding that arises out of an action for divorce . . . , the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets.

**{¶94}** At the hearing, counsel for Pfalzgraf testified about her experience, her hourly rate, and the $21,764.50 in fees she had incurred representing Pfalzgraf. The magistrate ordered Kuchera to pay Pfalzgraf $500 toward her attorney fees as a condition to purge his contempt, but did not otherwise award attorney fees. In overruling Pfalzgraf's objection concerning attorney fees, the trial court noted Pfalzgraf's testimony that maternal grandfather was paying her attorney fees and found that the $500 award was equitable and attributable to the finding that Kuchera was in contempt for failing to pay child support.

{¶95} Although the amount of attorney fees awarded was much less than had been requested, we cannot find that the award of $500 in attorney fees was so low as to shock the conscience. *See In re Q.R.*, 2026-Ohio-341, at ¶ 30 (1st Dist.). Kuchera was successful in his motion to modify parenting time. And he prevailed on all but one of Pfalzgraf's allegations of contempt. Under these circumstances, the trial court did not abuse its discretion in failing to award Pfalzgraf additional attorney fees.

{¶96} The third assignment of error is overruled.

### V. GAL Fees

{¶97} Pfalzgraf's fourth assignment of error challenges the trial court's order that she pay half of the GAL's outstanding fees.

{¶98} We review a trial court's award of GAL fees for an abuse of discretion. *Ho v. Co.*, 2024-Ohio-2424, ¶ 12 (1st Dist.).

{¶99} Hannigan filed a motion on January 22, 2025, requesting payment of outstanding fees in the amount of $7,542.50. An itemized statement of the incurred fees was attached to the motion. Hannigan testified that the fees incurred were reasonable in light of the case and the complexity of the issues involved. Counsel for Kuchera and Pfalzgraf were given the opportunity to cross-examine Hannigan on her requested fees.

{¶100} Pfalzgraf first contends that the trial court violated her due-process rights by hearing the GAL's motion for fees on the same date that the motion was filed in violation of Sup.R. 48.02(H)(4) and Hamilton C.P., Domestic Relations Div., Loc.R. 10.5.

{¶101} Sup.R. 48.02(H)(4) provides, "Unless a hearing is requested by a party or the court within fourteen days after a motion for payment is filed, a court shall issue an order regarding payment of guardian ad litem fees and expenses approving or

29

denying any portion of the requested fees and expenses and allocating payment to one or more of the parties as appropriate." Hamilton C.P., Domestic Relations Div., Loc.R. 10.5(A)(5) contains similar language.

**{¶102}** First, we note that the Rules of Superintendence and the local rules serve as administrative guidelines and do not have the force of law or provide substantive rights. *In re Guardianship of Hyde*, 2024-Ohio-1878, ¶ 24 (1st Dist.) (the Rules of Superintendence contain administrative directives, do not have the force of law, and do not provide grounds for reversal); *Morgan v. Jones*, 2022-Ohio-1831, ¶ 20 (1st Dist.) (a court's local rules are designed to facilitate case management and do not set forth substantive principles of law or implicate constitutional rights).

**{¶103}** Second, a hearing was held on Hannigan's request for fees on the date the motion was filed and both parties were given an opportunity to question her on the fees incurred. Pfalzgraf's argument that her right to request a hearing was violated is somewhat insincere, given that a hearing was, in fact, held. Further, a decision was not issued until approximately two months after the hearing. At no time in the two-week period after Hannigan's motion was filed did Pfalzgraf request an additional hearing on the GAL's fees.

**{¶104}** Pfalzgraf further argues that the trial court abused its discretion by failing to consider Sup.R. 48.02(H)(3) and ordering her to pay half of the fees when the appointment was at Kuchera's request, he failed to pay child support, and she was unemployed. Sup.R. 48.02(H)(3) sets forth various factors for a trial court to consider when determining how to allocate GAL fees. These factors include the GAL's hourly rate; the parties' incomes, assets, and financial circumstances; and the conduct of the parties. *See* Sup.R. 48.02(H)(3)(a)-(e).

**{¶105}** Neither the magistrate, nor the trial court when reviewing Pfalzgraf's

objections, specifically referenced Sup.R. 48.02(H)(3). But the magistrate did discuss the parties' financial circumstances. With respect to Kuchera, she found that he "has been unemployed on and off for the last 18 months but testified that he has a new job and is currently working." With respect to Pfalzgraf, the magistrate found that she "is not currently employed and testified that she receives an exemption for the work-requirement to receive SNAP benefits [although] she is not currently receiving any type of disability."

{¶106} The trial court found that Kuchera had already paid $3,500 towards the GAL fees, and that with the magistrate's equitable division of the remaining fees, Kuchera was responsible for $7,321.25 of the total fees and Pfalzgraf $3,771.25. The court found that this division was equitable. We agree. Kuchera ultimately was found responsible for nearly two thirds of the fees incurred. In light of his greater earning capacity and income, this was reasonable and not an abuse of discretion.

{¶107} Pfalzgraf's fourth assignment of error is overruled.

### VI. Conclusion

{¶108} Having found no error in the trial court's modification of the parenting schedule for C.K., denial of the remaining alleged violations in Pfalzgraf's motion for contempt, award of attorney fees, or division of GAL fees, we affirm the court's judgment.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.